**KRAVET & VOGEL, LLP**
1040 Avenue of the Americas, Suite 1101
New York, New York 10018

Donald J. Kravet (DK-2772)
Tel: (212) 997-7634
Fax: (212) 997-7686

*Attorneys for Plaintiffs*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
For Sale By Owner Magazine, Inc., and
Barbara Mallires and Steve Mallires formerly d/b/a
Worthington Publishing,

                       Plaintiffs,

           - against -

ForSaleByOwner.com Corp.

                       Defendant.
--------------------------------------------------------------x

ECF CASE

**FIRST AMENDED COMPLAINT and JURY DEMAND**

08 cv 0570

       Plaintiffs For Sale By Owner Magazine, Inc., and Barbara Mallires and Steve Mallires, formerly doing business as Worthington Publishing, by their attorneys Kravet & Vogel, LLP, allege for their Complaint against defendant ForSaleByOwner.com Corp., as follows:

### NATURE OF THE CASE

       1.    Plaintiffs have brought this action alleging claims against defendant for breach of contract and unjust enrichment, to recover the principal sum believed to be not less than $4.6 million, plus interest thereon, representing lost revenue to plaintiffs as a result of defendant's breach of contract and wrongful appropriation of such sum, during the period of January 2002 through

the present. In addition, plaintiffs bring this action seeking specific declaratory relief, pursuant to the Federal Declaratory Judgment Act and F.R.C.P. 57.

## THE PARTIES

2. Plaintiff For Sale By Owner Magazine, Inc. ("Magazine") is a corporation formed under the laws of the State of Michigan, with a principal place of business located at 8789 Hall Road, Utica, Michigan.

3. Plaintiffs Steven Mallires and Barbara Mallires are individuals residing at 1046 Devonshire, Grosse Pointe Park, Michigan.

4. Upon information and belief, defendant ForSaleByOwner.com Corp. ("FSBO.com" or "FSBO") is and was at all times relevant herein a corporation formed under the laws of the State of New York, with its current principal place of business located at 60 East 42nd Street, New York, New York.

## JURISDICTION AND VENUE

5. Jurisdiction exists pursuant to 28 U.S.C. §1332(a) in that this matter concerns a dispute between citizens of different states. Moreover, the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is appropriate in this district pursuant to 28 U.S.C. §1391(a) in that defendant FSBO is subject to personal jurisdiction in the district. Further, this district is specified in a contractual choice of venue provision agreed to between the parties.

## RELEVANT FACTS

7. FSBO is a company which publishes an internet website that advertises residential properties for sale. The FSBO site charges a flat fee to potential property sellers of real property (potential sellers of real property are hereinafter referred to as "Potential Sellers") who then post and advertise their own property listing on the site without retention of a real estate agent.

8. The fee paid by the Potential Seller varies depending on the geographic location, the advertising services chosen and the length of time the posting is maintained on the site.

9. FSBO has or had contracts with a number of entities and/or individuals such as the Mallires', who have been assigned by defendant a dedicated "sub-site" to the FSBO site. Sub-sites are organized by U.S. postal zip codes, with any given sub-site covering numerous geographically contiguous zip codes. When a Potential Seller initially visits the FSBO website, he/she is first asked to identify the zip code for the property to be listed for sale. If the zip code identified belongs to a sub-site, the Potential Seller is supposed to be automatically transferred to that sub-site and, once transferred to the sub-site, from that point forward the Potential Seller is interfacing exclusively with the sub-site. If an identified zip code does not belong to a sub-site, the Potential Seller continues to interface with defendant FSBO's website.

10. Parties who have sub-sites on the FSBO website (such as plaintiffs herein) set their own pricing and make their own financial arrangements with Potential Sellers. Significantly, a party assigned a dedicated sub-site has

the exclusive right to all of the economic benefits to be derived from all Potential Sellers who list properties for sale within the Territory - - that is, the zip codes that have been contractually allocated to that sub-site.

11. On or about August 23, 2001, Barbara and Steve Mallires (the "Mallires'") doing business as Worthington Publishing, entered into a written license agreement (the "License Agreement") with FSBO, which agreement was drafted by FSBO. Pursuant to the terms of the License Agreement, the Mallires were assigned a dedicated sub-site which covered specified zip codes in the Detroit, Michigan area. The zip codes related to the Mallires' sub-site were referred to in the agreement as the "Territory".

12. Subsequent to entering into the License Agreement, in or about May 2003, the Mallires' formed Magazine, which became the entity through which the terms of the License Agreement were subsequently carried out by the Mallires'.

13. Pursuant to the License Agreement, any Potential Sellers who attempt to post a listing on the FSBO website for real property located in the "Territory" (certain postal zip codes that have been assigned exclusively to Magazine), were to be automatically linked to the dedicated sub-site provided by FSBO to Magazine. The zip codes that were assigned by FSBO exclusively to Magazine are provided in a schedule attached to the License Agreement. Accordingly, for each property listed in the Territory, Magazine was to receive the entire economic benefit of the property listing including, but not limited to, a fee paid by the Potential Seller to post a property listing on the site, as well as any

subsequent upgrades and/or renewals to the listing requested by the Potential Seller.

14. On or about June 2005, Magazine and FSBO entered into a listing agreement (the "Listing Agreement"), which amended and consolidated the terms of the License Agreement. Like the License Agreement, the Listing Agreement was drafted by FSBO.

15. Other than with respect to the term of the contract, the Listing Agreement was substantially the same as the License Agreement, affording Magazine the same exclusive rights to all property listings within the Territory. Additionally, the zip codes designated as being included in the Territory remained the same.

16. Confirming Magazine's exclusive right to property listings within the Territory are several e-mail exchanges between FSBO and Magazine. Specifically, in a May 18, 2005 e-mail, Damon Giglio, then President of FSBO, confirmed to Magazine that Magazine would, "*continue to receive all our 'FSBO Listings' in your 'territory'....*"

17. Similarly, in an e-mail dated May 19, 2005, summarizing FSBO's position, Mr. Giglio, on behalf of FSBO, confirmed to Magazine that: "*You will have a dedicated sub-site (exactly what you have now) on our web site and [will] continue to receive all our 'FSBO listings' in your 'territory'....*"

18. Notwithstanding FSBO's acknowledged contractual obligation to forward to Magazine (and prior to Magazine, the Mallires' doing business as Worthington Publishing) all Potential Sellers seeking to list properties in the

Territory, FSBO failed to do so and, instead, retained for itself numerous listings of properties within the Territory, thereby depriving plaintiffs of the economic benefit of such listings, and wrongfully appropriating such benefit to itself, in violation and breach of the License Agreement and subsequent Listing Agreement (hereinafter collectively referred to as the "Agreement").

19.   The misappropriated listings of Potential Sellers that were to have been, but were not, forwarded to plaintiffs' sub-site include *inter alia*, listings by individual homeowners with properties in the Territory, listings for properties in foreclosure, properties listed for sale by builders, properties listed by Inest (a company which maintains a searchable database of recently built homes for sale), and renewals of any of the foregoing.

20.   Indeed, pursuant to a "Builder Signup" program, FSBO solicits and directly lists properties for sale by builders in bulk, which properties are located within plaintiffs' exclusive Territory, yet has repeatedly failed to forward such listings to plaintiffs' sub-site, notwithstanding its contractual obligation to do so.

21.   Beyond improperly procuring for itself listings of properties located in the Territory, FSBO also breached its contractual obligations under the Agreement in other ways.  For example, a Potential Seller who was properly directed by FSBO to plaintiffs' sub-site and listed a home for sale, could purchase subsequent "upgrades" - - additional enhancements - - to the listing for the property. To do so, the Potential Seller must log onto an "administration page" on the FSBO website. The administrative page, however, is under the

direct control of FSBO, with the result that FSBO rather than Magazine receives the economic benefit of the upgrades to listings in the Territory, and it has not passed that benefit on to plaintiffs.

22. At some time during the first half of 2007, a potential buyout of FSBO's publicly traded parent company, the Tribune Company, was announced. Aware that it was in flagrant and ongoing breach of its contractual obligations owed to plaintiffs and, on information and belief, motivated by the concern that it faced legal liability and substantial exposure for damages, in or about September 2007, FBSO sought to amend the Agreement with plaintiffs. As part of the proposed amendment, FSBO's current President, Thomas Finke, requested in writing that Magazine expressly waive "any and all" claims it may have against FSBO under the Agreement, including "the presence of Inest, home-builder and foreclosure listings on the [FSBO.com] Web Site."

23. FSBO's proposed amendment further stated, "Notwithstanding anything to the contrary in the Listing Agreement, listings from Inest, foreclosures and homebuilders may appear on ForSaleByOwner.com in the Territory. [Magazine] will receive no compensation related to such listings."

24. In addition, FSBO's President specifically requested that Magazine waive its right to FSBO's sale of "upgrades" to Potential Sellers with properties located in the Territory.

25. These proposed amendments, requested by FSBO's President (who on information and belief is an attorney-at-law), represent a clear

7

acknowledgement by FSBO of: (i) Magazine's right to all such listings and upgrades under the Agreement and, (ii) FSBO's breaches of the Agreement.

26. Additionally, FSBO offered "free trials" by which Potential Sellers could place listings on the FSBO website for a two week period without paying a fee. Upon the expiration of the free trial period, Potential Sellers who wanted to renew the listing were required to pay a fee. However, notwithstanding the fact that many of these Potential Sellers were renewing properties located in the Territory, they were not linked or directed to Magazine's sub-site. Instead, they were retained on FSBO's site, in breach of the Listing Agreement.

27. The above-mentioned proposed amendments to the Listing Agreement proposed by FSBO's President, Thomas Finke, also included a request that Magazine expressly waive "any and all claims" arising from the "sale of advertising packages to 'free trial' customers." Like the other proposed amendments, this requested modification to the contract constitutes a clear and convincing acknowledgement by FSBO of its breach of its contractual obligations owed to Magazine.

28. Further evidence of FSBO's breach of the Agreement is readily apparent from a comparison of the listings of Potential Sellers contained on the FSBO website, with listings on Magazine's sub-site for the same date. For example, one such comparison reveals that on May 10, 2007, FSBO's website contained 597 listings of properties within the Territory, all of which, pursuant to the Agreement, should have been, *but were not*, directed to and listed exclusively on, Magazine's sub-site.

29. Similarly, a review of FSBO's website for October 18, 2007 and November 20, 2007, and other periods, demonstrates that on such dates, at least 50% of the listings for properties in the Territory were listed on FSBO's website without having gone through Magazine's sub-site. That is, less than half of the Potential Sellers who should have been directed to and listed exclusively through Magazine, were not directed to the sub-site.

30. On information and belief, FSBO's failure to direct Potential Sellers to plaintiffs' dedicated sub-site, and some or all its other breaches of contract alleged herein, have been ongoing during the entire six (6) year period preceding the filing of the instant complaint.

31. On information and belief, as a direct result of FSBO's numerous and ongoing breaches of contract, plaintiffs have suffered damages in an amount to be determined but believed to be in excess of $4.6 million, exclusive of interest.

32. On or about December 13, 2007, plaintiffs' legal counsel wrote to FSBO setting out, among other things, the breaches of contract alleged herein and demanding the payment of money damages. Notwithstanding such demand, FSBO has failed to respond in any manner to plaintiffs' counsel.

### FIRST CAUSE OF ACTION
### (Breach of Contract)

33. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 32 above as if fully set forth herein.

34. The License Agreement and the subsequent Listing Agreement, which amended and consolidated the License Agreement, constitutes a valid, binding and enforceable contract between plaintiffs and defendant FSBO.

35. As set forth above, defendant breached the License Agreement and subsequent Listing Agreement by *inter alia*: (i) failing to direct all Potential Sellers with properties in the Territory to plaintiffs' dedicated sub-site, (ii) failing to direct to plaintiffs all "upgrades" and renewals by Potential Sellers with properties in the Territory and, (iii) failing to direct to plaintiffs' sub-site "free trial" customers who renew listings of properties in the Territory.

36. As a result of the foregoing, plaintiffs have suffered damages in an amount to be determined, but believed to be in excess of $4.6 million, no part of which has been paid although duly demanded.

**SECOND CAUSE OF ACTION**
**(Unjust Enrichment)**

37. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 36 above as if fully set forth herein.

38. By: (i) failing to direct all Potential Sellers with properties in the Territory to plaintiffs' dedicated sub-site and retaining such listings for itself, (ii) failing to direct to plaintiffs all "upgrades" and renewals by Potential Sellers with properties in the Territory and, (iii) failing to direct to plaintiffs' sub-site "free trial" customers who renew listings of properties in the Territory, and retaining for itself the economic benefits derived therefrom, FSBO has been unjustly enriched, to the detriment of plaintiffs. In equity and good conscience, FSBO should not be permitted to retain such economic benefits.

39. As a result of defendants' wrongful taking and retention of the economic benefits that should have gone to plaintiffs, FSBO has been unjustly enriched, in an amount to be determined, but believed to be in excess of $4.6 million, no part of which has been paid although duly demanded.

### THIRD CAUSE OF ACTION
### (Declaratory Judgment)

40. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 39 above as if fully set forth herein.

41. This is a claim for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, and FRCP 57, for the purpose of determining a question of actual controversy between the parties.

42. Specifically, pursuant to the terms of the Listing Agreement, commencing upon the termination of said agreement, Magazine will have the right, for a period of three (3) years, to post listings on FSBO's website of any properties procured by Magazine (regardless of geographic location), and pay a fee to FSBO of twenty dollars ($20.00) per listing.

43. In discussing the above provision of the Listing Agreement with plaintiff Barbara Mallires, FSBO's President, Thomas Finke, has refused to fully acknowledge Magazine's rights, stating that, "This is really a problem," seeking to renegotiate the terms, and indicating that there is a dispute as to Magazine's post termination rights.

44. Moreover, although plaintiffs' counsel sent FSBO a letter dated December 13, 2007, in which plaintiffs sought to have the parties' respective

rights post-termination clarified and, in particular, to have FSBO confirm plaintiffs' position, FSBO has failed and refused to respond.

45. Unless the parties' respective rights and obligations post termination are clarified and determined by a court of law, Magazine is unable to plan for the upcoming termination of the Listing Agreement, and will be forced to pursue its business arrangements under a cloud of uncertainty as to its legal rights and responsibilities.

46. Accordingly, a declaratory judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this claim.

47. As a result of the foregoing, Magazine seeks a declaratory judgment from this Court pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, that upon termination of the Listing Agreement, Magazine has the right, for a three (3) year period, to list properties from any geographic location on FSBO's website, and pay FSBO a one-time fee of twenty dollars ($20.00) per listing.

WHEREFORE, plaintiffs respectfully requests that the Court grant judgment against defendant FSBO as follows:

(i) On the First Cause of Action, in the principal sum of not less than $4.6 million, plus interest thereon;

(ii) On the Second Cause of Action, in the principal sum of not less than $4.6 million, plus interest thereon;

(iii) On the Third Cause of Action, a declaratory judgment declaring that, upon termination of the Listing Agreement, Magazine has the right, for a

three (3) year period, to list properties from any geographic location on FSBO's website, and pay FSBO a one-time fee of twenty dollars ($20.00) per listing; and

(ii)   Such other and further relief as deemed just and proper.

## JURY TRIAL DEMAND

TRIAL BY JURY ON ALL ISSUES UPON WHICH SUCH TRIAL MAY BE HAD IS HEREBY DEMANDED.

Dated:  New York, New York
        January 24, 2008

KRAVET & VOGEL, LLP
*Attorneys for Plaintiffs*

By: _____
Donald J. Kravet (DK 2772)
A Member of the Firm

1040 Avenue of the Americas,
 Suite 1101
New York, New York 10018
Tel.: (212) 997-7634
Fax:  (212) 997-7686