UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————X

FOR SALE BY OWNER MAGAZINE, INC. and
BARBARA MALLIRES and STEVE MALLIRES
formerly d/b/a WORTHINGTON PUBLISHING,

                    Plaintiff,

       -against-

ForSaleByOwner.com, Corp.

                Defendants.

———————————————————————————X

Case No. 08 CIV 0570 (DAB)

**FORSALEBYOWNER.COM,
CORP.'S  ANSWER TO
AMENDED COMPLAINT AND
<u>COUNTERCLAIMS</u>**

      Defendant ForSaleByOwner.com, Corp. ("FSBO"), by its attorneys Leader &
Berkon LLP, as and for its Answer to the First Amended Complaint of Plaintiffs For Sale By
Owner Magazine, Inc. ("Magazine"), and Barbara Mallires and Steve Mallires formerly d/b/a
Worthington Publishing (collectively, "Plaintiffs"),  responds as follows:

<u>**ANSWER**</u>

      1.      FSBO admits that Plaintiffs have brought this action and, except as so
admitted, otherwise denies the remaining allegations in Paragraph 1 of the Amended Complaint.

      2.      FSBO denies knowledge or information sufficient to form a belief as to
the truth of the allegations in Paragraph 2 of the Amended Complaint.

      3.      FSBO denies knowledge or information sufficient to form a belief as to
the truth of the allegations in Paragraph 3 of the Amended Complaint.

      4.      FSBO admits the allegations in Paragraph 4 of the Amended Complaint.

      5.      FSBO denies knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 5 of the Amended Complaint.

6.    In response to the allegations in Paragraph 6 of the Amended Complaint FSBO responds that venue is appropriate in the United States District Court for the Southern District of New York.

7.    FSBO admits it is a company that owns and operates an Internet website that advertises real property for sale and, except as so admitted, otherwise denies the allegations in Paragraph 7 of the Amended Complaint.

8.    FSBO admits that the fees paid by individuals or entities that advertise on FSBO's website vary based on the Advertising Package selected, and, except as so admitted, otherwise denies the allegations in Paragraph 8 of the Amended Complaint.

9.    FSBO admits that it has, or had, contracts with certain entities and/or individuals relating to sub-sites of the FSBO website pertaining to certain geographic areas and, except as so admitted, otherwise denies allegations in Paragraph 9 of the Amended Complaint.

10.    FSBO denies the allegations in Paragraph 10 of the Amended Complaint.

11.    FSBO admits that it entered into an agreement with Worthington Publishing, a sole proprietorship, on or about August 23, 2001 (the "License Agreement"), respectfully refers the Court to the License Agreement and, except as so admitted, otherwise denies the allegations in Paragraph 11 of the Amended Complaint.

12.    FSBO denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 of the Amended Complaint.

13.    FSBO respectfully refers to the Court to the License Agreement and otherwise denies the allegations in Paragraph 18 of the Amended Complaint.

14.    FSBO admits that it entered into an agreement with Magazine on or about June 29, 2005 (the "Listing Agreement"), respectfully refers the Court to the Listing Agreement and, except as so admitted, otherwise denies the allegations in Paragraph 14 of the Amended Complaint.

15.    FSBO respectfully refers the Court to the License Agreement and the Listing Agreement and otherwise denies the allegations in Paragraph 15 of the Amended Complaint.

16.    FSBO denies the allegations in Paragraph 16 of the Amended Complaint.

17.    FSBO denies the allegations in Paragraph 17 of the Amended Complaint.

18.    FSBO denies the allegations in Paragraph 18 of the Amended Complaint.

19.    FSBO denies the allegations in Paragraph 19 of the Amended Complaint.

20.    FSBO denies the allegations in Paragraph 20 of the Amended Complaint.

21.    FSBO denies the allegations in Paragraph 21 of the Amended Complaint.

22.    FSBO denies the allegations in Paragraph 22 of the Amended Complaint.

23.    FSBO respectfully refers the Court to the Proposed Amendment to the Listing Agreement and otherwise denies the allegations in Paragraph 23 of the Amended Complaint.

24.    FSBO denies the allegations in Paragraph 24 of the Amended Complaint.

25.    FSBO admits that it offers "free trials" to potential sellers and, except as so admitted, otherwise denies the allegations in Paragraph 25 of the Amended Complaint.

26.    FSBO denies the allegations in Paragraph 26 of the Amended Complaint.

27.    FSBO denies the allegations in Paragraph 27 of the Amended Complaint.

28.    FSBO denies the allegations in Paragraph 28 of the Amended Complaint.

29.    FSBO denies the allegations in Paragraph 29 of the Amended Complaint.

30.    FSBO denies the allegations in Paragraph 30 of the Amended Complaint.

31.    FSBO denies the allegations in Paragraph 31 of the Amended Complaint.

32.    FSBO admits that, on or about December 13, 2007, Plaintiffs' legal counsel wrote a letter to FSBO and otherwise denies the remaining allegations in Paragraph 32 of the Amended Complaint.

## AS AND FOR FSBO'S ANSWER TO THE FIRST CAUSE OF ACTION

33.    In response to Paragraph 33 of the Amended Complaint, FSBO repeats and realleges each and every response to Paragraphs 1 through 32 of the Amended Complaint as if fully set forth.

34.    FSBO admits that the Listing Agreement is a binding and enforceable contract, respectfully refers the Court to the License Agreement and the Listing Agreement and, except as so admitted, otherwise denies the allegations in Paragraph 34 of the Amended Complaint.

35.    FSBO denies the allegations in Paragraph 35 of the Amended Complaint.

36.    FSBO denies the allegations in Paragraph 36 of the Amended Complaint.

## AS AND FOR FSBO'S ANSWER TO THE SECOND CAUSE OF ACTION

37.    In response to Paragraph 37 of the Amended Complaint, FSBO repeats and realleges each and every response to Paragraphs 1 through 36 of the Amended Complaint as if fully set forth.

4

38.    FSBO denies the allegations in Paragraph 38 of the Amended Complaint.

39.    FSBO denies the allegations in Paragraph 39 of the Amended Complaint.

## AS AND FOR FSBO'S ANSWER TO THE THIRD CAUSE OF ACTION

40.    In response to Paragraph 40 of the Amended Complaint, FSBO repeats and realleges each and every response to Paragraphs 1 through 39 of the Amended Complaint as if fully set forth.

41.    FSBO admits that Plaintiffs purport to set forth a claim for a declaratory judgment, and, except as so admitted, otherwise denies the allegations in Paragraph 41 of the Amended Complaint.

42.    FSBO respectfully refers the Court to the Listing Agreement and otherwise denies the allegations in Paragraph 42 of the Amended Complaint.

43.    FSBO denies the allegations in Paragraph 43 of the Amended Complaint.

44.    FSBO admits that, on or about December 13, 2007, Plaintiffs' legal counsel wrote a letter to FSBO and, except as so admitted, otherwise denies the allegations in Paragraph 44 of the Amended Complaint.

45.    FSBO denies the allegations in Paragraph 45 of the Amended Complaint.

46.    FSBO denies the allegations in Paragraph 46 of the Amended Complaint.

47.    FSBO denies the allegations in Paragraph 47 of the Amended Complaint.


## FIRST AFFIRMATIVE DEFENSE

1.    Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted against FSBO.

5

### SECOND AFFIRMATIVE DEFENSE

2.      Plaintiffs' claims are barred, in whole or in part, by any failure on its part to use reasonable care to minimize or mitigate their alleged damages.

### THIRD AFFIRMATIVE DEFENSE

3.      Plaintiffs' claims are barred by the doctrines of estoppel, waiver and laches, *inter alia,* because the Plaintiff delayed for an unreasonable period of time the filing and pursuit of their alleged claims.  Moreover, specifically with respect to Plaintiffs' allegations concerning the presence of Inest and foreclosure listings on FSBO's website, at least Barbara Mallires was aware of such presence for years and did not object to such presence.

### FOURTH AFFIRMATIVE DEFENSE

4.      Plaintiffs' claims are barred in whole or in part by release.  Indeed, the Listing Agreement expressly superseded the prior License Agreement.

### FIFTH AFFIRMATIVE DEFENSE

5.      Plaintiffs' claims are barred by the doctrine of unclean hands.

### SIXTH AFFIRMATIVE DEFENSE

6.      Plaintiffs' damage claims for "all of the economic benefits to be derived from all Potential Sellers who list properties for sale within the Territory" should be barred.

### SEVENTH AFFIRMATIVE DEFENSE

7.      Plaintiffs' damages claims should be dismissed or barred as unduly speculative and unsupported.

### EIGHTH AFFIRMATIVE DEFENSE

8.      Plaintiffs Barbara Mallires and Steve Mallires formerly d/b/a Worthington Publishing (the "Individual Plaintiffs") are not parties to the Listing Agreement.  They have no

standing to assert any of the claims set forth in the Amended Complaint. All such claims purportedly brought by the Individual Plaintiffs should be dismissed for failure to state claim upon which relief can be granted.

## NINTH AFFIRMATIVE DEFENSE

9.      FSBO hereby asserts, and does not waive, any other applicable affirmative defenses under the Federal Rules of Civil Procedure.

## FSBO'S COUNTERCLAIMS AGAINST PLAINTIFFS

1.      As and for its Counterclaims against Plaintiffs, FSBO, by its attorneys, Leader & Berkon LLP, alleges as follows:

## BACKGROUND

**The FSBO Business**

2.      FSBO owns and operates an Internet website with the domain name of www.forsalebyowner.com (the "FSBO Site"). FSBO has owned and operated the FSBO Site since at least 1999. It is one of the top real estate related websites in the United States.

3.      Potential sellers of homes/real property can post advertisements for the sale of their homes/real property on the FSBO Site. Potential buyers of real property can search through the FSBO Site for homes/real property, contact sellers, and then transact to buy homes/real property directly from those sellers. This process through which homes/real property are sold "by owner" saves the transacting parties the cost of commissions that would be paid to real estate agents.

4.     When a potential seller initially visits the FSBO Site, that potential seller can choose to identify the zip code where he would like to potentially list a property for sale.  If the seller wants to then list a property for sale, he can choose among a variety of advertising options offered (the "Advertising Package(s)").   The potential seller chooses the Advertising Package it desires, pays the accompanying fee, and then lists its property for sale on the FSBO Site.

5.     Additionally, FSBO has entered into agreements with certain local publishers who are assigned a dedicated "Sub-Site" to the FSBO Site.

6.     The Advertising Packages range from basic Internet-only listings with a renewing monthly fee of under $100 to "Deluxe" or "Premium" offerings that are multi-media, include physical products like yard signs and brochures, and can cost a flat fee on an "until sold basis" of up to approximately $900.  In addition, FSBO offers upgrades for additional services and products (for example, web videos or increased picture "slide shows" per listing) at an additional charge (the "Upgrades.")  Generally, all fees for Advertising Packages purchased on the FSBO website and for any Upgrades are paid directly by the purchaser of the Advertising Package or Upgrade to FSBO.  In some cases, like in the Detroit, Michigan territory, if a dedicated Sub-Site exists, then fees for Advertising Packages purchased on the Sub-Site are paid directly by the purchaser of the Advertising Package to the local publisher.

**FSBO's Brand Rights and Business Model**

7.     FSBO owns a registered trademark in the name ForSaleByOwner.com in connection with, *inter alia*, magazines featuring real estate listings and online real estate listing and information services (the "FSBO Mark").  FSBO also created a business plan to provide services, such as access to the FSBO Site and software that supports the Sub-Sites of local

8

publishers, and materials for the marketing and sale of real estate properties listed on the FSBO Site in conjunction with the local publishers' newspapers and magazines in local areas (the "Business Model").

8.      FSBO's Business Model includes without limitation an administrative database, automated Internet software, marketing and support materials, and other advertising content. The Business Model contemplates that FSBO will enter into co-branding partnerships with local publishers of real estate newspapers and magazines. These local publishers obtain a Sub-Site to the FSBO Site and the right to use the FSBO Mark. FSBO obtains promotion and branding in those publications and certain fees paid by the publishers to FSBO.

**The Listing Agreement**

9.      FSBO entered into such an arrangement with Magazine: the June 29, 2005 Listing Agreement by and between FSBO and Magazine (the "Listing Agreement"). The Individual Plaintiffs are not parties to the Listing Agreement. The Listing Agreement replaced and entirely superseded a previous August 23, 2001 License Agreement by and between FSBO and a sole proprietorship known as Worthington Publishing (the "License Agreement").

10.      Under the Listing Agreement, Magazine has a dedicated Sub-Site giving it the right to post seller listings for a grouping of contiguous zip codes in the Detroit, Michigan area (the "Territory"). Except for certain vacation homes located in Michigan, Magazine has no right to post any seller listings on its Sub-Site from outside the Territory. Even for certain vacation homes, Magazine has no right to post listings from another local publisher's territory without express written consent from such publisher.

11.      Magazine enjoys the benefit of the FSBO Mark and the FSBO brand both on its Sub-Site and through its print publication. Magazine also takes the benefit of FSBO's

Business Model and uses it in connection with its Sub-Site and in its print publication.

Moreover, Magazine's Sub-Site relies on the administrative "back end" infrastructure of the

FSBO Site for its functionality.  In connection with the Business Model, Magazine did not pay

for or create an independently functioning commercial website of its own.  Magazine does pay

FSBO certain fees for the listings posted on the FSBO Site that have ranged between $15 to $20

per listing.

      12.     In exchange, Magazine explicitly agreed in Section V(A)(3) of the Listing

Agreement not to promote any competing websites on its Sub-Site:

> Publisher [Magazine] will have access to Publisher's Subsite and
> can promote its Publication and other services offered by Publisher
> but not a competing website.

      13.     Magazine also agreed to promote FSBO in its print publication, as long as

it was using the Business Model and benefiting from the Sub-Site, and to provide copies of, and

circulation information about, its print publication to FSBO.  Section VI of the Listing

Agreement provides in pertinent part that:

> A.     So long as Publisher is using the Rights and Business
> Materials, Publisher will include on the Publication cover page a
> reference to ForSaleByOwner's Web Site;
>
> B.     So long as Publisher is using the Rights and Business
> Materials, to the extent that as each issue of the Publication is
> prepared for printing there is available blank space, without the
> necessity of Publisher printing additional pages for the sole
> purpose of accommodating ForSaleByOwner, Publisher will print
> promotional advertisements proposed by ForSaleByOwner in such
> available space up to one full page in each issue of the Publication
> without charge to ForSaleByOwner.
>
>           *      *      *
>
> D.     As each issue of the Publisher's publication is published,
> Publisher will provide ForSaleByOwner with 1 copy of such
> publication.  Publisher will also provide ForSaleByOwner with

circulation information regarding the distribution of the
Publication.

## Magazine's Unfair Competition and Plan to Usurp FSBO's Business Nationwide

14.    Despite the express terms of the Listing Agreement, Magazine has been
promoting a national competitor of FSBO, HomesByOwner.com (www.homesbyowner.com), on
its Sub-Site.

15.    In addition, Magazine has been redirecting traffic from the Sub-Site to
another website owned and operated by Magazine, that also prominently promotes FSBO's
national competitor, HomesByOwner.com, before a consumer purchases an Advertising
Package.

16.    Moreover, while continuing to use the Business Model and benefit from
the Sub-Site, Magazine has renamed its print publication HomesByOwner.com and runs a
website on the HomesByOwner.com website.

17.    Furthermore, despite the terms of the Listing Agreement, Magazine has
failed to include any reference to the FSBO Site on the cover of its print publication while
continuing to enjoy the benefits of the Sub-Site and the Business Model.

18.    HomesByOwner.com is a direct competitor of FSBO in the market for
online real estate listings.  HomesByOwner.com competes with FSBO for the website views or
"hits" of potential buyers of homes/real property and competes with FSBO for advertising
revenue from potential sellers of homes/real property.

19.    Magazine has also taken the unjustified and baseless position that, if the
Listing Agreement is terminated, Magazine will have the right to post seller listings on the FSBO
Site nationwide.  Despite the language and structure of the Listing Agreement, in Magazine's

11

bad faith view, the termination of the Listing Agreement will give it substantially broader

contractual rights than the Listing Agreement itself.

        20.     Plaintiffs, through their counsel Donald J. Kravet, Esq., stated in a

December 13, 2007 letter to FSBO that:

> It is our position, that Publisher [Magazine] will have a continuing
> right, for a period of three years after termination, to post listings
> on FSBO's website of any properties procured by our clients, for
> $20.00 per listing.  Significantly, there is no geographic limitation
> as to the location of such properties and, thus, my clients are <u>not</u>
> restricted to the Territory with respect to their post-termination
> rights.  [emphasis original].

        21.     The Listing Agreement provides no such nationwide right for Magazine to

post listings on the FSBO Site for a mere $20.00 per listing.  Magazine will drive traffic and

seller listings, on a nationwide basis, to HomesByOwner.com, all through its continuing use of

the FSBO Site.

        22.     Magazine is already using the FSBO Mark, Brand, Business Model and

the FSBO Site itself to promote FSBO's direct competitor HomesByOwner.com and to drive

traffic to websites promoting HomesByOwner.com.  Magazine has been promoting

HomesByOwner.com on its Sub-Site in direct violation of the Listing Agreement.  While

continuing to use the Business Model and benefit from the Sub-Site, Magazine also promotes

HomesByOwner.com in its print publication, which Magazine has *renamed*

HomesByOwner.com.  Moreover, Magazine does not promote FSBO in that print publication

even though it is obligated to do so under the Listing Agreement.  Indeed, FSBO is only

mentioned in the print publication in conjunction with HomesByOwner.com, as a small icon on

within page 4, and small series of line items on page 5, of the latest issue of its print publication

(February 22 – March 21, 2008 Edition).  By contrast, the print publication is named

HomesByOwner.com and HomesByOwner.com is promoted extensively in the print publication. Magazine is actively and deliberately misappropriating FSBO's Mark, Brand, Business Model, and the FSBO Site.

23.    Indeed, Magazine has already taken seller listings from outside its Territory, including from another local publisher's territory, in violation of its obligations, posted them through its Sub-Site, and kept the listing fees (minus the $20 payment to FSBO) for itself. Upon information and belief, Magazine intends to continue to promote HomesByOwner.com and to drive traffic toward HomesByOwner.com, all while using FSBO's Site. Magazine will, on a nationwide basis, misappropriate FSBO's Mark, Brand, Business Model and the FSBO Site itself all to promote and drive traffic and seller listings to a direct competitor of FSBO at FSBO's expense and to its detriment.

**AS AND FOR ITS FIRST COUNTERCLAIM**
**AGAINST PLAINTIFFS FOR BREACH OF CONTRACT**

24.    FSBO repeats and realleges the allegations in Paragraphs 1 through 23 of its Counterclaims as if fully set forth herein.

25.    Magazine agreed in the Listing Agreement not to promote any competing websites on its Sub-Site: "Publisher [Magazine]...can promote its Publication and other services offered by Publisher but not a competing website." Yet, Magazine has been promoting a national competitor of FSBO, HomesByOwner.com (www.homesbyowner.com), on its Sub-Site. In addition, Magazine has been redirecting traffic from the Sub-Site to another website owned and operated by Magazine that also prominently promotes FSBO's national competitor, HomesByOwner.com, before a consumer purchases an Advertising Package. Accordingly, Magazine is in breach of the Listing Agreement.

26.     Because Magazine continues to use the Business Model and benefit from the Sub-Site, Magazine is obligated under the Listing Agreement to promote FSBO on the cover of its print publication as set forth in Paragraph 13 herein.  It is not currently doing so.  By contrast, Magazine is heavily promoting FSBO's competitor HomesByOwner.com in its print publication, now named HomesByOwner.com.  Indeed, FSBO is only mentioned in the print publication in conjunction with HomesByOwner.com, as a small icon on within page 4, and small line series of line items on page 5, of the latest issue of its print publication (February 22 – March 21, 2008 Edition).  By contrast, the print publication is named HomesByOwner.com and HomesByOwner.com is promoted extensively in the print publication.  Moreover, while continuing to use the Business Model and benefit from the Sub-Site, Magazine has also not provided FSBO the agreed-upon advertising space, nor provided FSBO with copies of the print publication.

27.     Moreover, Magazine is using the FSBO Site, through its Sub-Site, to promote HomesByOwner.com.

28.     Accordingly, Plaintiffs have breached the Listing Agreement by, among other things, promoting a direct competitor of FSBO on its Sub-Site, by redirecting traffic from the Sub-Site to another website owned and operated by Magazine that also prominently promotes HomesByOwner.com before a consumer purchases an Advertising Package, by not promoting FSBO in its print publication, not giving FSBO the advertising space Magazine is obligated to provide to FSBO in the print publication, and not giving copies of the print publication to FSBO. Magazine's breach of contract has damaged FSBO in an amount to be proven at trial but in no event less than $1,000,000 together with interest thereon.

14

## AS AND FOR ITS SECOND
## COUNTERCLAIM AGAINST PLAINTIFFS FOR
## <u>BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING</u>

29.    FSBO repeats and realleges the allegations contained in Paragraphs 1 through 28 of its Counterclaims as though fully set forth herein.

30.    A duty of good faith and fair dealing applied to the conduct of the parties to the Listing Agreement, as it does to all contracts governed under New York law.

31.    Magazine breached the duty of good faith and fair dealing by, among other things, (a) intentionally and purposefully promoting a competing website, HomesByOwner.com, on its Sub-Site in violation of the Listing Agreement, and (b) by failing to promote FSBO on the cover of its print publication while continuing to use the Business Model and benefit from the Sub-Site.  By its acts and omissions, Magazine intentionally and purposefully deprived FSBO of the benefit of the bargain from the Listing Agreement that FSBO would have received but for Magazine's bad faith acts.

32.    Magazine is using the FSBO Site, through its Sub-Site, to promote FSBO's direct competitor, HomesByOwner.com.  Magazine is also using the FSBO Business Model for its and competitor HomesByOwner.com's benefit by promoting HomesByOwner.com in its print publication and on its Sub-Site and by redirecting traffic from Magazine's Sub-Site to another website owned and operated by Magazine that also prominently promotes HomesByOwner.com before a consumer purchases an advertising package.  Indeed, FSBO is only mentioned in Magazine's print publication in conjunction with HomesByOwner.com, as a small icon on within page 4, and small series of line items on page 5, of the latest issue of its

print publication (February 22 – March 21, 2008 Edition).  By contrast, the print publication is

named HomesByOwner.com and HomesByOwner.com is promoted extensively in the print

publication. It is clear that Magazine is actively and deliberately misappropriating FSBO's Mark,

Brand, Business Model and the FSBO Site to promote itself and HomesByOwner.com at

FSBO's expense and to its detriment.

33.    Moreover, according to Magazine's own statements, it intends to broaden

its misuse of the FSBO Mark, Brand, Business Model and the FSBO Site to promote and drive

traffic to FSBO's direct competitor, HomesByOwner.com, on a nationwide basis.

34.    FSBO suffered and continues to suffer damages as a result of Magazine's

breach of the duty of good faith and fair dealing, in an amount to determined at trial but in any

event no less than $1,000,000.

**AS AND FOR ITS THIRD**
**COUNTERCLAIM AGAINST PLAINTIFFS FOR**
**DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201 & 2202**

35.    FSBO repeats and realleges the allegations in Paragraphs 1 through 34 of

its Counterclaims as if fully set forth herein.

36.    Upon termination of the Listing Agreement, Plaintiffs unjustifiably seek,

both in their Third Cause of Action for a Declaratory Judgment and in other demands to FSBO,

the right "for a three (3) year period, to list properties from any geographic location on FSBO's

website and pay FSBO a one-time fee of twenty dollars ($20.00) per listing."

37.    The Listing Agreement grants Magazine the right to post seller listings,

from its Territory, on its Sub-Site for $15 to $20 per listing.  Upon termination the Listing

Agreement gives Magazine the right to continue to post listings, from its Territory, on the FSBO

Site for three (3) more years.  There is no contractual basis for Magazine to post seller listings

that Magazine has obtained from outside of its Territory. The right to post seller listings for the minimal fee of $15 to $20 out of listing fees that range upwards to nearly $900 is limited to postings in Magazine's Territory – the Detroit, Michigan area. There is nothing in the Listing Agreement granting Magazine any nationwide rights.

       38.    Allowing Magazine to post seller listings on the FSBO Site from outside of its Territory goes far beyond the scope of rights granted to Magazine under the Listing Agreement and would substantially interfere with FSBO's business relations with prospective purchasers of Advertising Packages. Moreover, Magazine has been using the FSBO Site itself as a means to promote FSBO's direct competitor, HomesByOwner.com. Indeed, Magazine has already promoted HomesByOwner.com on its Sub-Site and redirected traffic from Magazine's Sub-Site to another website owned and operated by Magazine that also prominently promotes HomesByOwner.com before a consumer purchases an Advertising Package. Moreover, Magazine has already shown a willingness to improperly take seller listings from outside its Territory, including from another local publisher's territory, in violation of its obligations, post them through its Sub-Site, and keep the listing fees (minus the $20 payment to FSBO) for itself. Magazine's plan is to use the FSBO Site to promote and drive traffic and seller listings to HomesByOwner.com on a nationwide basis.

       39.    Plaintiffs are not entitled to recovery on their Third Cause of Action. Such a result would work an inequity and would give Magazine broader rights than provided for in the Listing Agreement. Accordingly, FSBO is entitled to a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and U.S.C. §§ 2201 & 2202:

       (a) denying Plaintiffs' Third Cause of Action in its entirety; and

(b) setting forth that, upon the termination of the Listing Agreement, Magazine will not have the right to post listings on the FSBO Site for seller listings outside of Magazine's Territory.

## AS AND FOR ITS FOURTH COUNTERCLAIM
## AGAINST PLAINTIFFS FOR UNFAIR COMPETITION

40.    FSBO repeats and restates the allegations in Paragraphs 1 through 39 of its Counterclaims as if fully set forth herein.

41.    FSBO owns and has developed its Mark, its Brand, its Business Model, and the FSBO Site (the "FSBO Property"). Magazine has access to and use of the FSBO Property only as defined and limited by the Listing Agreement.

42.    Magazine is misusing its FSBO-sponsored Sub-Site to promote HomesByOwner.com, a website run by FSBO's direct competitor. In doing so, Magazine in bad faith has misappropriated and continues to misappropriate the FSBO Business Model for the financial and commercial benefit of itself and FSBO's direct competitor, HomesByOwner.com.

43.    Magazine's Sub-Site bears the FSBO Mark and FSBO Brand. Magazine is improperly associating Magazine's Sub-Site, including the FSBO Mark and Brand thereon, with HomesByOwner.com and its website. In doing so, Magazine in bad faith has misappropriated and continues to misappropriate the goodwill of FSBO's Mark and Brand for the financial and commercial benefit of itself and FSBO's direct competitor, HomesByOwner.com.

44.    Magazine is further misusing its print publication to heavily promote FSBO's competitor, HomesByOwner.com, while continuing to use its Business Model and benefit from the Sub-Site. Indeed, Magazine has renamed its print publication

HomesByOwner.com.  Additionally, Magazine brazenly lists HomesByOwner.com as one of the "Top FSBO Sites" on page 5 of the latest issue of its print publication (February 22 – March 21, 2008 Edition).  In doing so, Magazine in bad faith has misappropriated and continues to misappropriate the good will of FSBO's Marks and the Business Model for the financial and commercial benefit of itself and FSBO's direct competitor, HomesByOwner.com.

45.    Through the conduct described herein, Magazine is actively and deliberately misappropriating the investment of time, skill, expenditures, and labors of FSBO and using them to compete against FSBO for Magazine's own advantage.  This is a misuse of FSBO's Property to promote Magazine and FSBO's competitor, HomesByOwner.com, for Magazine's gain and at FSBO's expense and detriment.

46.    Magazine's conduct in taking what does not belong to it, and using what it has taken in competition with FSBO, constitutes misappropriation and unfair competition under the common law.

47.    As a direct consequence of such unfairly competitive acts and practices, Magazine has profited, is profiting, and, unless such acts and practices are enjoined by this Court, will continue to profit by misappropriating the time, skills, labor, and money that FSBO has invested in the FSBO Property and the goodwill and reputation that FSBO has developed in connection with the FSBO Property.

48.    As a direct consequence of Magazine's acts of unfair competition specified herein, FSBO has suffered, is suffering, and, unless enjoined by this Court, will continue to suffer injury and damages for which FSBO is entitled to relief under New York common law.

49.    By reason of Magazine's unfairly competitive acts and practices,
Magazine has caused, is causing, and, unless such acts and practices are enjoined by the Court,
will continue to cause immediate and irreparable harm to FSBO for which there is no adequate
remedy at law, and for which FSBO is entitled to injunctive relief under New York common law.
FSBO should be awarded damages in an amount to be determined at trial but at least $5,000,000
and a permanent injunction should issue enjoining Plaintiffs from misappropriating FSBO
Property, including without limitation promoting HomesByOwner.com or other competing
websites on the FSBO Site or Magazine's Sub-Site.

## AS AND FOR ITS FIFTH COUNTERCLAIM
## AGAINST PLAINTIFFS FOR TORTIOUS
## INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

50.    FSBO repeats and restates the allegations in Paragraphs 1 through 49 of its
Counterclaims as if fully set forth herein.

51.    Upon termination of the Listing Agreement, Plaintiffs seek the right "for a
three (3) year period, to list properties from any geographic location on FSBO's website and pay
FSBO a one-time fee of twenty dollars ($20.00) per listing."

52.    If Magazine can list potential sellers' properties, nationwide, on the FSBO
site at $20.00 a listing, FSBO will be denied the prospective business advantage of the full
Advertising Package listing fees that it would otherwise be paid directly by potential sellers
outside of Magazine's Territory.  Given that the Advertising Package fees range from $100 to
$900, FSBO could incur damages of up to $880 a listing.

53.    The Listing Agreement grants Magazine the right to post seller listings,
from its Territory, on its Sub-Site for $15 to $20 per listing.  There is no contractual basis for
Magazine to post seller listings outside of its Territory on the FSBO Site.  Any right to post for

the minimal fee of $15 to $20 out of listing fees that range upwards to nearly $900 is limited to postings in Magazine's Territory – the Detroit, Michigan area. There is nothing in the Listing Agreement granting Magazine any nationwide rights.

54.    FSBO has an advantageous business relationship with potential purchasers of Advertising Packages outside the Territory. That relationship is characterized by the expectancy that potential sellers of real estate will purchase Advertising Packages, post their listings on the FSBO Site, and pay FSBO the full fees for those Advertising Packages.

55.    FSBO's business relationships with potential purchasers of Advertising Packages contain the probability of future economic benefit to FSBO in the form of profits and fees from the sales of Advertising Packages. FSBO has an expectancy in these advantageous business relationships.

56.    Plaintiffs are aware of FSBO's business relationships with potential purchasers of Advertising Packages outside of Magazine's Territory. As a party to the Listing Agreement and the operator of its Sub-Site, Magazine is fully aware of the fees FSBO charges for its Advertising Packages.

57.    Magazine intentionally seeks to interfere with FSBO's prospective business advantages with potential purchasers of Advertising Packages outside the Territory by posting those seller listings on the FSBO Site, paying FSBO a mere $20.00 and then compounding that injury by routing these seller listings through FSBO's direct competitor HomesByOwner.com. Indeed, this interference is wrongful, improper and has no contractual basis.

58.    Indeed, Magazine has already shown a willingness to improperly take seller listings from outside its Territory, including from another local publisher's territory, in violation of its obligations, post them through its Sub-Site, and keep the listing fees (minus the $20 payment to FSBO) for itself.  Upon information and belief, Magazine is actively pursuing seller listings nationwide that it intends to route to itself and to HomesByOwner.com while only paying FSBO $20.00 per listing.

59.    As a direct and proximate result of Magazine's actions, FSBO will suffer economic harm, including without limitation: (1) the loss of the revenues and fees FSBO would have derived had FSBO sold Advertising Packages under the same or similar terms to those offered on the FSBO Site; and (2) competitive harm to FSBO by routing FSBO's potential customers through its direct competitor HomesByOwner.com.

60.    As a direct and proximate result of Magazine's actions FSBO will suffer damages as a result of Magazine's tortious interference with FSBO's prospective business advantage in an amount to be proved at trial, but in any event an amount no less than $5,000,000.

## AS AND FOR ITS SIXTH COUNTERCLAIM AGAINST PLAINTIFFS FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

61.    FSBO repeats and restates the allegations in Paragraphs 1 through 60 of its Counterclaims as if fully set forth herein.

62.    Upon termination of the Listing Agreement, Plaintiffs seeks the right "for a three (3) year period, to list properties from any geographic location on FSBO's website and pay FSBO a one-time fee of twenty dollars ($20.00) per listing."

63.    If Magazine can list potential sellers' properties, nationwide, on the FSBO site at $20.00 a listing, FSBO will be denied the prospective contractual relations of the full Advertising Package listing fees that it would otherwise be paid directly by potential sellers outside of Magazine's Territory.  Given that the Advertising Package fees range from $100 to $900, FSBO could incur damages of up to $880 a listing.

64.    The Listing Agreement grants Magazine the right to post seller listings, from its Territory, on its Sub-Site for $15 to $20 per listing.  There is no contractual basis for Magazine to post seller listings outside of its Territory on the FSBO Site.  Any right to post for the minimal fee of $15 to $20 out of listing fees that range upwards to nearly $900 is limited to postings in Magazine's Territory – the Detroit, Michigan area.  There is nothing in the Listing Agreement granting Magazine any nationwide rights.

65.    FSBO has advantageous prospective contractual relations with potential purchasers of Advertising Packages outside the Territory.  That relationship is characterized by the expectancy that potential sellers of real estate will purchase Advertising Packages, post their listings on the FSBO Site, and pay FSBO the full fees for those Advertising Packages.  The terms of those prospective contractual relations are set forth on the FSBO Site.

66.    FSBO's prospective contractual relations with potential purchasers of Advertising Packages contain the probability of future economic benefit to FSBO in the form of profits and fees from the sales of Advertising Packages.  FSBO has an expectancy in these advantageous prospective contractual relations.

23

67.    Plaintiffs are aware of FSBO's prospective contractual relations with potential purchasers of Advertising Packages outside of Magazine's Territory. As a party to the Listing Agreement and the operator of its Sub-Site Magazine is fully aware of the fees FSBO charges for its Advertising Packages.

68.    Magazine intentionally seeks to interfere with FSBO's prospective contractual relations with potential purchasers of Advertising Packages outside the Territory by posting those seller listings on the FSBO Site, paying FSBO a mere $20.00 and then compounding that injury by routing these seller listings through FSBO's direct competitor HomesByOwner.com. This interference is wrongful, improper and has no contractual basis.

69.    Indeed, Magazine has already shown a willingness to improperly take seller listings from outside its Territory, including from another local publisher's territory, in violation of its obligations, post them through its Sub-Site, and keep the listing fees (minus the $20 payment to FSBO) for itself. Upon information and belief, Magazine is actively pursuing seller listings nationwide that it intends to route to itself and to HomesByOwner.com while only paying FSBO $20.00 per listing.

70.    As a direct and proximate result of Magazine's actions FSBO will suffer economic harm, including without limitation: (1) the loss of the revenues and fees FSBO would have derived had FSBO sold Advertising Packages under the same or similar terms to those offered on the FSBO Site; and (2) competitive harm to FSBO by routing FSBO's potential customers through its direct competitor HomesByOwner.com.

71.    As a direct and proximate result of Magazine's actions FSBO will suffer damages as a result of Magazine's tortious interference with prospective contractual relations in an amount to be proved at trial, but in any event an amount no less than $5,000,000.

## AS AND FOR ITS SEVENTH COUNTERCLAIM
## AGAINST PLAINTIFFS FOR INTENTIONAL
## INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

72.    FSBO repeats and restates the allegations in Paragraphs 1 through 71 of its Counterclaims as if fully set forth herein.

73.    Upon termination of the Listing Agreement, Plaintiffs seeks the right "for a three (3) year period, to list properties from any geographic location on FSBO's website and pay FSBO a one-time fee of twenty dollars ($20.00) per listing."

74.    If Magazine can list potential sellers' properties, nationwide, on the FSBO site at $20.00 a listing, FSBO will be denied the prospective contractual relations of the full Advertising Package listing fees that it would otherwise be paid directly by potential sellers outside of Magazine's Territory.  Given that the Advertising Package fees range from $100 to $900, FSBO could incur damages of up to $880 a listing.

75.    The Listing Agreement grants Magazine the right to post seller listings, from its Territory, on its Sub-Site for $15 to $20 per listing.  There is no contractual basis for Magazine to post seller listings outside of its Territory on the FSBO Site.  Any right to post for the minimal fee of $15 to $20 out of listing fees that range upwards to nearly $900 is limited to postings in Magazine's Territory – the Detroit, Michigan area.  There is nothing in the Listing Agreement granting Magazine any nationwide rights.

76.    FSBO has advantageous prospective business relations with potential purchasers of Advertising Packages outside the Territory.  That relationship is characterized by

the expectancy that potential sellers of real estate will purchase Advertising Packages, post their listings on the FSBO Site, and pay FSBO the full fees for those Advertising Packages. The terms of those prospective business relations are set forth on the FSBO Site.

77.    FSBO's prospective business relations with potential purchasers of Advertising Packages contain the probability of future economic benefit to FSBO in the form of profits and fees from the sales of Advertising Packages. FSBO has an expectancy in these advantageous prospective business relations.

78.    Plaintiffs are aware of FSBO's prospective business relations with potential purchasers of Advertising Packages outside of Magazine's Territory. As a party to the Listing Agreement and the operator of its Sub-Site Magazine is fully aware of the fees FSBO charges for its Advertising Packages.

79.    Magazine intentionally seeks to interfere with FSBO's prospective business relations with potential purchasers of Advertising Packages outside the Territory by posting those seller listings on the FSBO Site, paying FSBO a mere $20.00 and then compounding that injury by routing these seller listings through FSBO's direct competitor HomesByOwner.com. This interference is wrongful, improper and has no contractual basis.

80.    Indeed, Magazine has already shown a willingness to improperly take seller listings from outside its Territory, including from another local publisher's territory, in violation of its obligations, post them through its Sub-Site, and keep the listing fees (minus the $20 payment to FSBO) for itself. Upon information and belief, Magazine is actively pursuing seller listings nationwide that it intends to route to itself and to HomesByOwner.com while only paying FSBO $20.00 per listing.

81.    As a direct and proximate result of Magazine's actions FSBO will suffer economic harm, including without limitation: (1) the loss of the revenues and fees FSBO would have derived had FSBO sold Advertising Packages under the same or similar terms to those offered on the FSBO Site; and (2) competitive harm to FSBO by routing FSBO's potential customers through its direct competitor HomesByOwner.com.

82.    As a direct and proximate result of Magazine's actions FSBO will suffer damages as a result of Magazine's tortious interference with prospective business relations in an amount to be proved at trial, but in any event an amount no less than $5,000,000.

**WHEREFORE,** FSBO demands judgment dismissing Plaintiffs' Amended Complaint and respectfully requests that this Court enter Judgment in its favor and against plaintiffs/counterclaimants:

(a)    As and for its First Counterclaim for Breach of Contract awarding damages in an amount to be determined at trial but at least $1,000,000;

(b)    As and for its Second Counterclaim for Breach of the Duty of Good Faith and Fair Dealing, awarding damages in an amount to be determined at trial but at least $1,000,000;

(c)    As and for its Third Counterclaim for Declaratory Judgment Under 28 U.S.C. §§ 2201 & 2202:
(i) denying Plaintiffs' Third Cause of Action in its entirety; and
(ii) setting forth that, upon the termination of the Listing Agreement, Magazine will not have the right to post listings on the FSBO Site for seller listings outside of Magazine's Territory;

(d)    As and for its Fourth Counterclaim for Unfair Competition, awarding damages in an amount to be determined at trial but at least $5,000,000 and issuing a permanent injunction enjoining Plaintiffs from misappropriating FSBO Property, including without limitation promoting HomesByOwner.com or other competing websites on the FSBO Site or Magazine's Sub-Site;

(e)    As and for its Fifth Counterclaim for Tortious Interference With Prospective Business Advantage, awarding damages in an amount to be determined at trial but at least $5,000,000;

(f)    As and for its Sixth Counterclaim for Intentional Interference With Prospective Contractual Relations, awarding damages in an amount to be determined at trial but at least $5,000,000;

(g)    As and for its Seventh Counterclaim for Intentional Interference With Prospective Business Relations, awarding damages in an amount to be determined at trial but at least $5,000,000;

(h)    awarding all costs, disbursements, expenses and fees incurred as a result of defendant's wrongful, tortious and morally culpable conduct, including without limitation reasonable attorney's fees and expenses; and

(i)    awarding such other and further relief as this Court deems just and proper.

Dated: New York, New York
        March 12, 2008

LEADER & BERKON LLP

By:_____
    GLEN SILVERSTEIN (GS-9174 )
    THOMAS K. RICHARDS (TR-8945)
    630 Third Avenue, 17th Floor
    New York, New York 10017
    (212) 486-2400

    *Attorneys for Defendant/Counterclaimant*
    *ForSaleByOwner.com, Corp.*